IxLOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiff, Darlene Cooper, individually and as tutrix of her minor daughter, Courtney Cooper, and against defendant, the Orleans Parish School Board, in the amount of $2,929,777.39 for injuries sustained by Courtney Cooper.

FACTS AND PROCEDURAL HISTORY:

On December 18,1991, Courtney Cooper, a six year old student at Medare Nelson Elementary School, was playing on a multi-event playground structure during recess. The playground structure included a firepole attached to a deck standing approximately 62 inches above the ground. The playground structure was designed to allow a child to stand on the deck, grasp the pole and slide down to the ground. As Courtney was standing on the deck and reaching for the pole, she was either bumped or pushed by another child. Courtney fell to the ground. She landed on her back. The fall caused a shearing injury to her spine rendering her a paraplegic.
Darlene Cooper, Courtney’s mother, individually and on behalf of Courtney, sued the Orleans Parish School Board, owner of the school; Landscape ^Structures, Inc., the manufacturers of the playground structure; D and A Associates, the seller of the playground structure; Donahue Favret, the contractor who installed the playground structure; Hewitt-Washington, architects and planners and Leonard Washington, architect, who were assigned to the construction project, which included the playground structure, various employees of the School Board as well as the liability insurers of the various defendants.
Landscape Structures, Inc., D and A Associates, Donahue Favret, Hewitt-Washington and Leonard Washington, all filed cross-claims against the School Board and each other. The School Board also filed cross-claims against these defendants. Each cross-claim alleged that the negligence of the cross-defendants was the proximate cause of Courtney’s injuries in whole or in part. If the cross-claimant was deemed responsible for Courtney’s injury, then the cross-defen *1261 dants were liable pursuant to theories of indemnity and/or contribution.
A bifurcated trial began on October 10, 1994. The trial judge was to render judgment on all claims against the School Board and its employees, (hereinafter, the Board). The jury was to render judgment on all claims against the other defendants.
On October 20, 1994, prior to the conclusion of the trial, plaintiffs settled their claims against all defendants except the Board.
After the various settlements were finalized, plaintiffs moved to dismiss the jury. By oral motion, the Board requested that the jury remain impaneled to hear the remaining claims.[1] Plaintiff’s motion was granted. The ^Board’s motion was denied. The trial court then recessed the trial to allow the Board time to seek supervisory writs to this court.
In its Petition for Supervisory Writs, the Board asserted that it had pending cross-claims against its co-defendants, that its co-defendants were only partially dismissed and, as such, it had a right to trial by jury on its cross-claims.
On October 21, 1994, this Court denied writs stating, “We find no error in the ruling complained of’.[2]
A bench trial then proceeded against the Board.
Judgment was rendered on November 9, 1994 in favor of plaintiff and against the Board finding it to be fifty (50%) percent liable for plaintiffs losses and against Donahue Favret, the contractor, Hewitt-Washington, the architect and Leonard Washington, architect, for the remaining fifty (50%) percent of plaintiffs losses. The court found no fault on the part of plaintiff, the unknown pushing child, Landscape Structures, Inc. or D and A Associates, the manufacturer and seller, respectively.
Defendant appeals the trial court judgment asserting the following assignments of error:
1) The trial court erred by denying the Board’s request for trial by jury.
2) The trial court erred in its allocation of fault among the Board, Donahue Favret and Hewitt Washington.
3) The trial court erred in limiting the combined fault of Donahue Favret and Hewitt Washington.[3]
| ^ASSIGNMENT OF ERROR 1:
The Board asserts that it was error for the trial court to dismiss the jury because it was entitled to trial by jury of its cross-claims against the settling defendants. In support of its argument, the Board cites McCoy v. Ouachita Parish Police Jury, 564 So.2d 747, 750 (La.App. 2nd Cir.1990).[4]
In McCoy, the trial court denied a request for trial by jury filed by both the parish police jury (political subdivision of the state) and its liability insurer. The appellate court granted writs and ordered a jury trial of all demands against the insurer and of the incidental demands of the police jury.
In rendering its decision, the reviewing court found that while Louisiana Revised Statute 13:5105 prohibited a jury trial of claims against the state and its subdivision, Louisiana Revised Statute 13:5035 explicitly allows jury trials for specified suits filed on behalf of the state.
At the time the instant suit was filed, these Statutes provided:
LSA R.S. 13:5105:
*1262 No suit against the state or a state agency or political subdivision[5] shall be tried by jury.[6]
LSAR.S. 5035:
All suits for trespass, for damages, or for possession of real property, filed by the State against any person, firm or corporar tion, and all matters incidental thereto shall be heard and determined by the court in a summary manner, Rin term time or vacation. Should a trial by jury be demanded, a special panel shall be drawn for such purpose in accordance with the presently existing law. All judgments rendered in any of these causes shall also be tried summarily by the appellate court having jurisdiction, (emphasis added)
In addressing this issue, we agree with the Court in McCoy that the interrelationship between Louisiana Revised Statutes 13:5105 and 13:5035 allows a political subdivision of the state to demand trial by jury of its incidental demands. These statutes, however, do not preclude adherence to the requirements of the Code of Civil Procedure.
Louisiana Code of Civil Procedure Article 1733 provides that a party may obtain a trial by jury by filing a pleading demanding same no later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury. Here, unlike in McCoy,[7] the Board failed to make a timely request for trial by jury on its cross-claims. The first request made by the Board was an oral request after trial had begun and plaintiff had settled with the other defendants. In fact, when the initial suit was filed, the Board was successful in having the claims against it and its employees tried by the judge. It did not seek a jury trial on the cross-claims against the other defendants at that time nor any other time except after trial commenced. Under these circumstances we find that the Board was not timely in its request for a jury trial against the cross-defendants. See, Sharkey v. Sterling Drug, Inc., supra. Our original writ disposition, finding no error in the trial court’s denial of the Board’s request, was correct.
This assignment of error is without merit.
|6The Board’s other two assignments of error require a factual review and application of the manifest error rule. Reviewing the evidence in an appellate opinion can be as lengthy and detailed as the court deems necessary. Some instances require only an overview while others require minute detail. Because of the seriousness of plaintiffs injuries and the amount of the award, we find it necessary to present a review of the evidence in great detail.
TESTIMONY ADDUCED AT TRIAL:[8]
COURTNEY COOPER:[9]
Courtney Cooper testified that on the day of the accident she fell from the deck of the playground apparatus while attempting to slide down the firepole. As she attempted to grab the pole with her left hand, someone pushed her. At trial she did not say that she was pushed, but only that she fell. She described the deck as crowded with children.
As she fell forward she described her body as twisting. She fell onto her back with her feet and buttocks up in the air. She testified that she came to rest between the firepole and the wooden timbers of the apparatus. She stated that when she hit the surface she felt an immediate numbness. She described the surface where she fell as made up of *1263 wood chips. Her description was “kind of hard”; a “little bit soft”; “only a teeny bit soft”.

J¿DARLENE COOPER:

On the day of the accident, Darlene Cooper, Courtney Cooper’s mother, was employed at the Nelson School as a secretary.
She testified that when it became apparent that Courtney’s injury was serious, she transported her to Charity Hospital. The treating physicians inquired about the area of the fall. In response to these inquiries, Darlene Cooper stated she returned to the site of the accident the following day.
She observed what appeared to be a plastic sheeting exposed under the wooden chips. She described the wooden chips as spread out and not very high in relation to the retaining timbers. At the foot of the firepole she described the chips as not fresh and appearing to be about one inch thick.

DR. JOSEPH NADELL:

Dr. Joseph Nadell, a pediatric neurosurgeon, treated Courtney Cooper at Children’s Hospital. Dr. Nadell testified that Courtney sustained a hemorrhage to the center of the spinal cord which caused her paralysis. This injury, he opined, was caused by blunt trauma as a result of falling on a non-forgiving surface which did not absorb a sufficient amount of energy.

JOSEPH TAYLOR, JR:

Joseph Taylor, Jr. testified that he is the principal of Nelson Elementary School. He agreed that the apparatus installed for the pre-kindergarten children was larger than for the older children. However, he stated that this was because the equipment for the older children, even though shorter, provided more |8difficult activities. He testified that the Board installed the resilient surface. When the wood chips were initially installed, they were mounded towards the center under the equipment. He stated that he worked out a daily duty schedule to insure teacher supervision at all times. In addition, he stated he verbally directed the custodians to maintain the chips by raking them two to three times per week. When the chips appeared low, he ordered more chips. He stated that between January, 1991 and December, 1991, he ordered the chips refilled twice.
He stated he walked the playground twice per day to cheek that it was properly maintained. He did admit that several times he was not pleased and communicated his displeasure to the custodian. He stated that he examined the surface below the apparatus following the accident and did not see anything unusual. He described the chips as “basically level” and did not see any part of the cloth lining.
He remembers that new chips arrived on December 17, 1991, the day before the accident and that they were installed the same day as the accident. However, when told that Jackie Cooper testified that the chips were installed on December 19,1991, the day after the accident, he stated that he would defer to Cooper’s memory.

J.L. MOLONY:

J.L. Molony testified that he is the CEO of D and A Associates, the manufacturer’s representative for Landscape Structures, Inc. He testified that he has been qualified in Louisiana as an expert in playground safety. He also testified that Landscape Structures, Inc. is a leader in research and development in playground equipment. He testified that although wood chips are widely used, |9they are not recommended. Wood chips, sand and pea gravel are acceptable surfaces but they all have their unacceptable features. Wood chips are recommended only as an alternative when the customer cannot afford the better rubberized surface. When the wood chips are used, the key is proper maintenance. The thickness of the resilient surface is determined by the height of the equipment. The height of the apparatus at the Nelson School from which plaintiff fell called for a resilient surface 6 to 8 inches thick.

TONYA HAHN:

Tonya Hahn testified that she is employed by D and A Associates. She testified that she helped prepare the paste-ups for the Nelson School equipment. She stated she received specifications for the equipment from Donahue Favret along with catalog cut sheets from Big Toys. The Big Toys catalog sheets provided the appropriate age group. *1264 However, in preparing the paste-ups, she was not aware of age designation.

JOHN M. COX:

John M. Cox testified that he is an independent contractor who contracted with the architect to be the Clerk of the Works on the Nelson School Project. He stated that his job was to observe the contractor’s work for compliance with the architectural plans and specifications. However, he stated that he did not have authority to force the contractor to adhere to the plans. If a discrepancy occurred, the change would have to be referred to the architect.
Cox testified that he was present when the equipment was installed by Anthony Bondi; the superintendent for the contractor. He admitted that it was his | ^obligation to see that the equipment was properly installed according to the manufacturer’s instructions. He also admitted that he did not inspect the concrete footing of the firepole but the instructions mandated that the bottom of the footing be 24 inches below the top of the finished grade.
Cox testified that it was the Board’s responsibility to install the resilient surface. This surface should consist of 4 to 6 inches of compacted soil and 6 to 8 inches of resilient surface for a total of 14 inches. He stated he was no longer on the project when the resilient surface was installed.
On cross examination, Cox testified that the retaining timbers should have been 13 to 14 inches high and not 7 inches high. He stated that it would be proper to pour the concrete footing at ground level as long as the retaining timbers are high enough to allow for 13 to 14 inches of resilient surface as per the manufacturer’s instructions.

LEONARD CHARLES WASHINGTON:

Leonard Washington testified that he is an architect with the firm of Hewitt-Washington and Associates. Hewitt-Washington was the architectural firm responsible for the Nelson School project. Many of the project plans were completed by him.
He stated that the architect’s duty is to insure that the contractor is in general compliance with the project plans, drawings and specifications. He described “general compliance” as no substantial deviation from what has been specified. As the project architect, Hewitt-Washington had the authority to reject the contractor’s work if it faded to substantially comply with the specifications. He admitted that Hewitt-Washington had a duty to see to it that Donahue Favret | ninstalled the playground equipment as per the manufacturers specifications. He admitted the playground equipment installation was accepted.
He testified that the decision on the type and placement of the playground equipment was strictly within the authority of the Board. He stated he was never informed which apparatus was for which age group or where each age group played in the school yard. He testified that his drawings were prepared from information provided by the school authorities and John Cox, the Clerk of the Works. He testified that the Board chose Landscape Structures Inc.’s equipment ostensibly because it was safer and of better quality. This choice was solely within the control of the Board. He denied any responsibility to object to the Board’s choice explaining that he was not an expert in playground safety and not qualified to judge if the Board’s choice was a responsible one.
He further denied any responsibility on the part of Hewitt-Washington in determining the kind of resilient surface to be used under the playground equipment or its installation. He stated that this responsibility belonged solely to the Board.
He admitted that he was not present when Donahue Favret poured the concrete footing for the firepole. He stated that he relied on John Cox’s report that the installation was proper. He described John Cox as an independent contractor responsible to both the Board and Hewitt-Washington.

LEONARD HELD:

Leonard Held testified that he was employed by Donahue Favret as the project manager for the Nelson School project. He stated that his field supervisor, Anthony Bondi actually installed the playground equipment using the | i2manufacturer’s specifications. Nothing in the instructions suggested that the footing be installed below *1265 ground level. Rather the top of the footing was supposed to be 10 to 14 inches from the finished grade (the top of the resilient surface). He stated that the finished grade (resilient surface) should have consisted of 6 inches of compacted soil and 6 to 8 inches of resilient material on top of that. The resilient surface was solely the Board’s responsibility. He testified that in order to install the proper surface, the retaining timbers forming the box around the apparatus would have to be at least 10 inches in height. The box installation was also the sole responsibility of the Board. Because the retaining timbers were only 7 inches in height, they were too short to provide the proper surface.

ANTHONY BONDI, JR:

Anthony Bondi, Jr. testified that he is an employee of Donahue Favret Contractors. He stated that he installed the playground equipment at the Nelson School.
He testified that he used the manufacturer’s diagram which he interpreted as showing the concrete footing at ground level. He also stated that when he shot the grade he took into consideration the height of the resilient surface and used a 10 inch minimum height from the highest point on the site plot. He testified he poured the footing to ground level because that is the way the plan indicated it should be poured. The footing was 14 inches wide by 14 inches in length. He stated that John Cox was present during the installation and agreed with him that the footing should be poured to ground level. He denied knowing Jackie Cooper or the architect. He stated that there were others around during the installation but that he did not know their identity. He testified that Lenny Held, hghis supervisor, took no active role in the installation and that he had no responsibility for the resilient surface. On cross examination he testified that no one complained about the installation and no one ordered or directed him to deviate from the manufacturer’s drawing.

JACKIE COOPER:

Jackie Cooper testified that he is employed by the Board as the safety training supervisor.
Cooper testified that his only input regarding the playground equipment was in the type and placement of the equipment. He did not install the equipment. He only installed the resilient surface. He stated that to the best of his knowledge, the concrete footing for the firepole was installed below ground level as per the manufacturer’s instructions. ■ However, he admitted that he was not present at the time of the installation.
Cooper stated that he did not use the manufacturer’s recommendations in installing the surface but instead, used a system recommended by a New England Company called the Fibar System. This system used washed gravel, felt and wood chips. In installing the surface, he erected retaining timbers 7 inches in height. He testified the timbers were 3 inches above the concrete footing for a total of 10 inches of resilient surface. He stated the maintenance of the surface was the responsibility of the school. Nelson School requested additional wood chips approximately one week before the accident and he believed they were installed the day after the accident.
On cross examination, Cooper testified that after being put in charge of safety, he studied the Consumer Product Safety Commission Guidelines. As a | ^result, he began removing unsafe equipment. In designing a surface, he recommended 4 inches of washed gravel on top of the concrete footing which should be recessed. On top of the gravel he recommended 8 to 10 inches of Fibar material with felt in between.
Cooper admitted that initially he designed the surfaces to be recessed but after completing one installation project he decided to install all future surfaces above ground because of the water table. Toward the sides of the surface, the chips were 5 to 6 inches deep and in the center the chips would be mounded to a height of 10 inches.
Cooper denied that the footing was poured to ground level because when it was dug up in 1993 he remembers having to go below ground. He stated the equipment was installed as per the manufacturer’s instructions which called for the footing to be recessed approximately 4 to 6 inches deep. Cooper *1266 disagreed with Bondi’s testimony that it was poured to ground level.
Cooper opined that the proper surface was more important than the equipment installation to prevent injury. He testified that he used the Board’s design to install the surface and instructed the school employees to rake the wood chips regularly because the surface is only as good as it is maintained.

KEN DUCOTE:

Ken Dueote testified that he is the Director of Facility Planning for the Board. Among his duties was to receive the architectural contracts for the school projects.
He stated that, in general, an architectural contract requires the architect to supervise the contractor’s work.
| 15The contract for the Nelson School project required a written change order to change or modify the project plans. The change order would have to go through the architect who would have to approve it. Pursuant to the contract, the architect would have to approve all changes and could not delegate their authority. Dueote opined that if the manufacturers installation instructions required the concrete footing to be recessed, and the contractor wanted to pour the concrete level with the ground, a written change order would have to be approved by the project architect. Dueote stated that Jackie Cooper would not be authorized to make such a change without first obtaining approval from the architect.

RONALD LEONE:

Ronald Leone testified that he is a registered architect and employee of the Board.
He testified that it is the responsibility of the project architect to prepare all construction documents including those for playground equipment if that equipment is part of the project. He stated that if the project architect adopts a manufacturer’s installation instructions for an item of equipment, then those instructions become part of the project documents. He agreed that according to Landscape Structure, Inc.’s installation instructions for the playground equipment, the concrete footing for the firepole should have been installed four to six inches below ground level. He denied that Jackie Cooper, safety supervisor for the Board, had authority to modify the manufacturer’s instructions and direct Donahue Favret to pour the concrete footing to ground level,

hfJ.D. ROBERTS:

J.D. Roberts, a safety consultant was accepted as an expert in safety.
He testified that the Consumer Products Safety Guidelines at the time the equipment was installed required that the concrete footing be installed below ground level “to prevent tripping and to protect a child in case of a fall”.
Roberts examined the accident site on February 14, 1992. He found a resilient surface of 6 inches of wood bark and said it was in “excellent condition”. However, he admitted that he was told that the surface had been refilled since the accident. He also testified that he found defects in the apparatus. The firepole diameter was too large and the deck height too high for plaintiffs age group. In addition, he found a lack of hand loops near the firepole. He did admit that these defects would not be relevant if plaintiff was pushed from the apparatus. He could not give a specific surface thickness required by the apparatus but did say that if the 14 inch surface recommended by the manufacturer had been installed, it would have been “less likely” that plaintiff would have been injured.

DR. JOSEPH L FROST:

Dr. Joseph L. Frost was recognized as an expert in education, job development, children’s play and play environments, including playground and swimming pool safety.
On February 12, 1993, Dr. Frost examined the resilient surface upon which plaintiff fell. He found the concrete footing was installed “at about level of the base ground”. Two inches of rock was on top of the concrete. On top of the rock was a fibrous membrane. Covering the membrane was 5 inches of wood mulch.
| x7Pr. Frost opined that the concrete footing was incorrectly installed and the major cause of plaintiffs injury. Based on the National Recreation Park Association and Consumer Product Safety Guidelines, the con- *1267 erete footing should have been installed 4 to 6 inches below ground level. The resilient surface on top of the concrete should consist of 10 to 12 inches of wood mulch or sand or pea gravel measuring ⅜ inch in diameter or less.
Dr. Frost described the installation of the equipment at the Nelson School as “out of character” with the guidelines. The footing was not recessed and ½ inch rock was used instead of the pea gravel. In addition, the retaining timbers were too short. They were 7 inches high instead of the recommended 12 inch height. He explained that the height of the timbers is important in providing enough mulch. Because the mulch compacts with use, 12 inches of mulch becomes 8 inches of resilient surface necessary for protection.
Dr. Frost also testified that the installation at the Nelson School did not conform to the manufacturer’s instructions. The manufacturer recommended 4 to 6 inches of compacted soil and 6 to 8 inches of resilient surfacing. The Nelson installation had no compacted soil and a concrete footing 24 inches wide instead of the recommended 14 inches. On top of the concrete was 5 inches of rock. Dr. Frost stated that mulch requires weekly maintenance such as raking to keep the surface resilient. Usually, the mulch needs replacement or replenishment every 6 months. He also testified that mounding the mulch under the equipment only lasts until the children begin to play. The mulch quickly disperses and levels out toward the edges of the surface.
ligln forming an opinion as to the condition of the surface on the day of the accident, Dr. Frost reviewed the deposition testimony of plaintiff, her mother and her brother.
Plaintiff described the surface as hard. Plaintiffs brother Dietrich stated that he saw the exposed felt under the mulch the same day as the accident. Darlene Cooper, plaintiffs mother, testified that she saw the exposed felt when she inspected the surface the day after the accident. Given their testimony and the construction and installation of the surface, Dr. Frost concluded that the mulch had compressed causing plaintiff to fall upon rocks and concrete.
On cross examination, Dr. Frost testified that the equipment chosen was not the best. He stated that D and A Associates made misleading statements about the Landscape Structures, Inc. equipment. In examining the apparatus he found a number of design defects. These included an absence of hand loops near the firepole, too large a distance between the firepole and the deck and overall, too large an apparatus for plaintiffs age group. However, while these factors may have contributed to plaintiffs injury, Dr. Frost conceded that the main cause was the lack of a proper resilient surface.

DR. WERNER GOLDSMITH:

Dr. Werner Goldsmith, professor emeritus at the University of California at Berkeley, was accepted as an expert in the field of biomechanics and safety engineering.
Dr. Goldsmith inspected the accident site on August 2, 1994 for the purpose of determining the mechanics of thé injury. He also interviewed plaintiff 113who with the use of a doll, described how she fell. Courtney explained that when she fell her body rotated and twisted.
Dr. Goldsmith conducted tests on the site to determine the amount of bearing, shearing and compression stress upon plaintiffs spinal column at the point of impact. From the information provided by plaintiff, he concluded that she fell on her back in the area of the T12-L1 vertebrae. As she landed her legs and buttocks were in the air with her head facing toward the right. This twisting motion caused her body to impinge on the T12-L1 area. As a result that area of the spine sustained stress levels of 909, 1060 and 1210 pounds per square inch. He explained that since the tensile strength of the spinal dura is 1460 pounds per square inch, the spinal cord did not rupture but instead sustained serious injury.
At the time Dr. Goldsmith performed his tests, he found the wood chips too compressed and condensed to properly absorb a fafi.
Dr. Goldsmith concluded that plaintiffs injuries are indicative of high resistive pressure indicating her body did not sink enough *1268 into the surface to absorb the energy from the fall.
Dr. Goldsmith stated that plaintiff fell from a height of approximately 61⅜ inches. To this he added 21 inches for her center of gravity. However, he concluded that while the height may have contributed slightly to plaintiffs injuries, the lack of a proper resilient surface was primarily the cause. He stated that a well maintained resilient surface would have substantially mitigated plaintiffs injuries. He also testified that rocks on top of the concrete footing were less resilient than if the rocks had been placed on top of compacted soil.

J20DR. HARRY LINCOLN SMITH:

DR Harry Lincoln Smith, an employee of Biodynamic Research Corporation, was recognized as an expert in the field of nuclear medicine, radiology and biomechanics, particularly in regards to traumatic injury.
He testified that plaintiff was injured at the T12-L1 spinal area called the conus me-dullaris. He opined that her injury was caused by a deceleration in the blood flow to that area of the spine. He described the injury as “unusual” and “freakish”. Internal tears in the vascular system caused blood clots which broke away and cut off the blood supply. It is for this reason that plaintiff appeared only slightly injured after the fall only to become paralyzed several hours later.
Dr. Smith disagreed with Dr. Frost’s opinion that plaintiff fell upon rocks and concrete. Rather, he opined that the lack of bruising to her skin and subcutaneous tissue indicated an energy absorbing surface that diffused the impact of the fall. The surface she fell upon was designed to produce this effect. He further stated that the wood chips were deep enough to produce a sufficiently absorbing surface to prevent severe injury save the “freakish nature” of plaintiffs injury. He explained that plaintiffs injury was “freakish” in that plaintiff had to fall in just the right manner to produce a deceleration shear injury to this area of the spine.
Dr. Smith admitted that he did not test the actual surface upon which plaintiff fell but the same type of surface. His tests were conducted pursuant to the standards of the American Society for Testing Materials. The tests revealed that for every 2 inches of mulch, the force of the impact was less. However, up to 6 inches, the difference is not appreciable. He opined that placing 6 inches of compacted soil on top of the concrete footing with 8 inches of pea gravel and 5 | finches of wood chips would not have absorbed more energy than if there was no compacted soil. The most energy absorbing material were the chips with the pea gravel used for drainage. Dr. Smith denied that anyone could provide an exact number as to the force of the impact experienced by plaintiff or the amount of force necessary to have produced her injuries.

ASSIGNMENTS OF ERROR 2 AND 3:

In these assignments of error, the Board complains about the trial judge’s assessment of 50% comparative fault upon it. Specifically, the Board asserts the trial judge erred in allocating no fault to Landscape Structures, Inc. (the manufacturer) and no fault to D and A Associates (the seller). The Board also asserts the trial judge erred in not finding that the fault of Donahue Favret (the contractor), Hewitt-Washington (the architect) and Leonard Washington, exceeded the fault of the Board with respect to the magnitude of the risk created; the significance of what was sought to be attained, the relative capacities of each defendant, and to the cost which each defendant would have to sacrifice to avoid the risk created.
The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong. Clement v. Frey, 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607, 610. The Supreme Court confirmed that the review of an allocation of comparative fault is governed by the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). In reaching this confirmation, the court concluded that the assessment of fault, like the assessment of damages, is also a factual determination. Clement, 666 So.2d at 609-610.
A reviewing court may reallocate fault only after it has found an abuse of discretion and then, only to the extent of lowering or raising the percentage of fault to *1269 the highest or lowest point. Clement, 666 So.2d at 609.
The fact finder has a duty to assess the demeanor and credibility of all witnesses, lay and expert. A reviewing court may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong”. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985), the Supreme Court set forth five factors which may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstance which might require the actor to proceed in haste, without proper thought.
In its reasons for judgment, the trial court found that the evidence established that the Board, Hewitt-Washington and Associates, Leonard Washington and Donahue Favret Contractors, Inc., “breached the duty to construct a play structure firepole in a manner that did not create an unreasonable risk of harm to children. The OPSB [Board] breached the applicable duty by inter alia, (1) failing to carefully install a good resilient surface, (2) failing to maintain a safe resilient surface under the equipment. Hewitt-Washington and Associates breached the applicable duty by failing to observe that Donahue-Favret Contractors, Inc. hadj^not followed the LSI instructions requiring the pouring of concrete below grade. Donahue-Favret Contractors, Inc. breached the applicable duty by failing to follow the LSI instructions requiring the pouring of concrete below grade.” Based on these conclusions, the trial court assessed the Board fifty (50%) percent fault and Donahue-Favret, Hewitt-Washington, and Leonard Washington, fifty (50%) percent fault.
We find no error in this allocation of fault. The installation of the concrete footing anchoring the firepole was the sole responsibility of Donahue Favret, Hewitt-Washington and Leonard Washington. The trial court rejected Anthony Bondi’s testimony that Jackie Cooper told him to pour the footing to ground level. The installation of the footing was not in accordance with the installation instructions of Landscape Structures which recommended the footing be recessed below ground level with 4 to 6 inches of compacted soil and 6 to 8 inches of resilient surface over the soil.
Examination of the accident site revealed the concrete footing, in addition to being poured at ground level, was 20 to 24 inches wide. Landscape Structures recommended it be no wider than 14 inches. The trial court found that under the contract with the Board, “... the architect was obligated to ‘observe’ the construction in lieu of ‘supervise’ the construction ... Leonard Washington failed to observe that the concrete was not installed 4 to 6 inches below grade as required by LSI’s instructions.”
The Fibar System which was supposed to be used for the surface called for ⅜ inch washed pea gravel. The evidence indicates that ½ inch rock was used.
latThe retaining timbers, used to hold the surface were only 7 inches high. Landscape Structures and the Consumer Product Safety Guidelines recommended a 14 inch high surface which, when compacted, would provide the proper 8 inch resilient surface. The evidence indicates that the surface, upon which plaintiff fell, was no higher than 5 inches, perhaps less.
The evidence also revealed that, on the day of the accident, the felt material separating the rocks from the wood chips was visible indicating the wood chips had dispersed and had not been adequately maintained. For this reason the proper energy absorbing surface was absent. Dr. Nadell testified that plaintiffs injury was caused by “blunt trauma.” Thus, the condition of the accident site and the type of injury sustained indicates *1270 that plaintiff fell directly onto the rocks and concrete.
Dr. Goldsmith conducted drop tests on the accident site. He concluded the surface, even three years after the accident was unreasonably dangerous and not as safe as it could have been. Both Dr. Frost and Dr. Goldsmith concluded that it was the lack of the ability of the surface to absorb plaintiffs fall that caused her injury. The installation and maintenance of a proper resident surface was solely the Board’s responsibility.
We do agree that there is evidence that design defects were present in the Landscape Structures play equipment. The apparatus where plaintiff was injured was the tallest play structure which had been designated for use by the smallest children. The structure lacked hand loops near the firepole which was too large in diameter and too far from the deck. However, there was no evidence that these defects, which the Board blames on Landscape Structures and D and A Associates, contributed to plaintiffs injury. Dr. Frost and J.D. Roberts bothj^testified that these defects were not the cause of the accident or the injury. J.D. Roberts stated that any testimony to the contrary would be “pure speculation”.
Thus, given the record before us, we cannot say the trial court’s allocation of fault is manifestly erroneous or clearly wrong. The preponderance of the evidence shows that the sole proximate causes of Courtney Cooper’s injury was the improper installation of the concrete footing and the improper installation and negligent maintenance of the resilient surface.
Applying the Watson factors, we conclude the Board created the greatest risk of harm to plaintiff by failing to provide a proper resilient surface. The Board had the ongoing duty to protect the children entrusted to its care. Even after the footing was poured incorrectly at ground level, the Board could have mitigated the danger by installing and maintaining the resilient surface as recommended by Landscape Structures, the Consumer Products Safety Guidelines and the Fibar System. It failed to do so.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are to be paid by appellant.
AFFIRMED.

. The record indicates that the Board’s motion was directed to the remaining claims. However, actually the Board sought trial by jury as to its cross-claims against the released defendants.

. Darlene Cooper et al v. Orleans Parish School Board, 94-C-2129 (La.App. 4th Cir. 10/21/94).

. In her brief, plaintiff states that she answered the Board’s appeal on January 5, 1995. However, it appears that plaintiff has not cross-appealed any issues because she has not asserted any assignment of error. In her brief, plaintiff only addresses the assignments of error asserted by the Board.

.Normally, the "law of the case” would control the disposition of this issue. However, being mindful of the fundamental right to a jury trial, we will address the merits of the issue. See, Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1st Cir.1992), writ denied, 605 So.2d 1099, writ denied, 605 So.2d 1100 (La.1992).

. LSA R.S. 13:5102(B) defines a “political subdivision” as including a “school board” or "other public or governmental body of any kind which is not a state agency”.

. This statute was amended by Acts 1993 No. 993, prohibiting trial by jury only against political subdivisions of the state.

. In McCoy, the parish police jury timely amended its pleadings incorporating a demand for trial by jury on its incidental demands.

. The testimony summarized pertains to the issue of fault. The testimony pertaining to the extent and duration of plaintiff's injuries has been reviewed but has not been summarized.

. Courtney Cooper testified at trial and via depositions of April 10, 1992 and July 26, 1993. The trial court allowed introduction of the depositions for the limited purpose of revealing "contradictory testimony”.