742 So.2d 55 (1999)
Darlene COOPER, et al.
v.
The ORLEANS PARISH SCHOOL BOARD.
No. 99-CA-0050.
Court of Appeal of Louisiana, Fourth Circuit.
September 8, 1999.
Writ Denied December 10, 1999.
*57 Robert E. Tarcza, G. Anthony Gelderman, III, Tina M. Walsh, L.L.C., Tarcza & Gelderman, New Orleans, and Catrice A. Johnson, New Orleans, Council for Plaintiff-Appellee.
Clare Jupiter, Bryan & Jupiter, New Orleans, and Franklin V. Endom, Jr., Polack, Rosenberg, Endom & Reiss, New Orleans, Counsel For Defendant-Appellant.
Court composed of Judge WILLIAM H. BYRNES, III, Judge MIRIAM G. Waltzer, Judge PATRICIA RIVET MURRAY.
BYRNES, Judge.
The crux of this case is the frustration plaintiffs have experienced in their attempts to collect in full on a final judgment against the Orleans Parish School Board because of the constitutional prohibition against seizing School Board funds and property.
Darlene Cooper, individually and on behalf of her minor daughter, Courtney Loraine Cooper (collectively referred to as "Cooper") sued the Orleans Parish School Board among others, in early 1992 for injuries sustained by Courtney. Following a bench trial (as to the School Board), judgment was rendered against the School Board in the amount of $2,929,777.39, plus legal interest.[1] This Court affirmed. Cooper v. City of New Orleans, 96-0243 (La. App. 4 Cir. 9/18/96); 680 So.2d 1259, writ denied, 96-2517 (La.12/6/96); 684 So.2d 938.
Within weeks after the denial of the School Board's application to the Supreme Court, Cooper filed the instant suit, alleging that the School Board "has refused to pay [the judgment] in violation of Article 12 § 10 of the Louisiana Constitution which waives immunity from liability for political subdivisions of the State of Louisiana." Cooper's petition went on to allege that "the defendant has refused to amend its budget to provide for the retirement of this debt, creating an unbalanced budget in direct violation of the provisions of LSA-R.S. 39:1301 et seq. (The Local Government Budget Act) and specifically subpart 39:1304(E) thereof. Despite notice from petitioner, defendant continues to operate without a balanced budget in violation of law." Additionally Cooper complained that the School Board incurred various forms of bonded indebtedness subsequent to Cooper's judgment which improperly prime Cooper's judgment.
It is undisputed that in 1994 the School Board discovered that it had health insurance claims for which it was self-insured exceeding what it had set aside for those claims by $13,000,000 or more. Over $10,000,000 expected to be used for the payment of general liability claims was transferred from the General Liability Fund to the Health Insurance Fund in an effort to deal with this problem. This left the *58 School Board with insufficient funds to pay tort claimants, including the Coopers. Initially the School Board tried to work out a way of funding the tort claims on a three to five year funding plan, but ultimately was forced to transfer the problem to the long term debt account.
During the course of the trial the plaintiffs raised issues that fall into two basic categories: (1) The failure of the School Board to comply with budget laws, regulations and policies during fiscal year ending June 30, 1995 when over $2,000,000 from the General Fund along with the over $10,000,000 intended to pay liability claims referred to above was used instead to fund the shortfall in the School Board's employee health plan, and (2) Equal Protection violations arising out of payments of claims arising subsequent to that of the plaintiffs.
The judgment below granted the plaintiffs an injunction ordering the School Board to formally ratify or reject "the transfer of funds from the general liability fund to the health care fund" for the fiscal year ending June 30, 1995 along with all costs. All other claims against the School Board were dismissed, largely because the trial judge found that under La. Const. Art. 12 § 10(C), he had no authority, either directly or indirectly to order the School Board to pay the plaintiffs' judgment.
The School Board appealed contesting the injunction and the award of costs. The plaintiffs answered the appeal, requesting that the injunction contained in the trial court judgment be amended to specify that it carry the penalty of contempt for noncompliance; enjoining the School Board from implementing its budget for the fiscal year beginning July 1, 1997 until all prior budgets which are materially misstated are correctly restated; enjoining the School Board to amend its operating budget for the fiscal year ending June 30, 1997 to restore funds which were transferred without authorization; enjoining the School Board from paying other debts and claims in preference to their judgment; and attorney's fees.

Was the Plaintiffs' Answer Timely?
On May 7, 1999, long after the time had elapsed for filing an answer to an appeal expired under LSA-C.C.P. art. 2133, the plaintiffs filed a motion to supplement the record with a copy of the answer they had filed in the trial court. Accordingly, this Court issued a rule to show cause why plaintiffs' answer should not be dismissed as not having been timely filed in this Court.
The Code of Civil Procedure is not particularly helpful on this issue. LSA-C.C.P. art. 2133 is the only article referring to answers, and it does not say where they are to be filed, whether in the trial court or in this Court. The "School Board Response To Show Cause Order", in a refreshing demonstration of candor and professionalism seen by this court all too rarely these days, acknowledges that:
Cooper's memorandum submitted on May 24, 1999, clearly demonstrates her Answer to Appeal was filed in the Civil District Court on May 5, 1998. (The School Board further acknowledges that her counsel then favored Board's counsel with a copy of that Answer.)
Thus the School Board claims no prejudice in its opposition to the plaintiffs' Answer to the Appeal. However, it is not necessary that the School Board show prejudice. The timeliness of an appeal or answer is jurisdictional and is not founded on prejudice.
It is undisputed that plaintiffs' answer was filed in the trial court long before the delays allowed by LSA-C.C.P. art. 2133 had expired. At the time it was filed in the trial court there was no record set up in this Court in which to file it. We find that the plaintiffs' answer was timely filed in the trial court, and hereby grant plaintiffs' motion to supplement the record therewith for the following reasons expressed by this Court in Diesel Engine *59 Repairs, Inc. v. Point Landing, Inc., 291 So.2d 791, 792 (La.App. 4 Cir.1974):
The time requirements of C.C.P. Article 2133 are not violated because the delay for filing the answer is not later than 15 days after the return day or the lodging of the record whichever is later. [Emphasis original.]
From the standpoint of practice, we find no reason for requiring counsel for the appellee to constantly watch for notice of the filing of the record in the court of appeal to make certain the answer is not filed later than 15 days thereafter.

Further appeals are favored. [Emphasis added.]

Constitutional Concerns
The equal protection clause "commands that states treat similarly situated people in a similar manner." Faheem-El v. Klincar, 841 F.2d 712, 727 (7th Cir.1988) (en banc). See City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The first question presented is what standard of review this court should use in examining the validity of the School Board's practice. Griffin High School v. Illinois High School Ass'n, 822 F.2d 671, 674 (7th Cir.1987). The court initially must determine whether the practice infringes on a fundamental right or discriminates on the basis of a suspect classification. When no suspect class[2] or fundamental right is involved, the court must apply a very deferential rational basis test. This is the usual standard of review. Id. "Under this test, legislation[3] is presumed to be valid, and will be sustained as long as the classification drawn by the statute is rationally related to a legitimate state interest." Griffin, 822 F.2d at 674. See also City of Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254; Vaden v. Village of Maywood, Ill, 809 F.2d 361, 365 (7 Cir.), cert. denied, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987).
The only case of which this court and the litigants are aware that has a close factual and legal resemblance to the instant case is that of Evans v. City of Chicago, 873 F.2d 1007, 1015-17 (7 Cir. 1989), cert. den. 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990). In Evans the plaintiffs complained that holders of tort judgments in excess of $1,000 against the City of Chicago were denied Equal Protection rights in the manner in which the City chose to prioritize the payment of those judgments. As the precise facts of Evans are important to establish its propinquity to the case before us, this Court feels the need to quote from Evans at greater length than is our usual custom, commencing at 873 F.2d at 1010:
[I]t was the practice and custom of the City to delay payment of judgments from two to four years. [page 1010]
* * * *
[T]he City normally paid enterprise judgments and contract judgments within thirty to one hundred-fifty days of *60 presentment.... Tort judgments of $1,000 or less were given priority and paid off within approximately thirty days of presentment. Judgments over $1,000 were paid off in the order they were entered, but at a much delayed rate. The average delay in payment of tort judgments over $1,000 ranged from fifteen months to four years after the entry of final judgment. Payment of some judgments apparently was delayed as long as nine years.... The delay in paying tort judgments stemmed from the City's practice of levying a special property tax each year to pay judgments at an amount that was far less than needed to pay the annual tally of judgments. The City refused to apply any other revenue to the payment of tort judgments. [pages 1010-1011]
* * * *
A former city comptroller testified that the prioritization was designed to accommodate a large number of small judgment creditors waiting for payment. Since a large number of small judgments could be paid with the limited amount of money in the 395 Fund, the total number of judgment creditors awaiting payment at any one time could be reduced. Small judgment holders were thus spared the lengthy waits experienced by large judgment holders and the City argues that plaintiffs failed to prove that the priority payments to small judgment creditors actually increased the delays experienced by large judgment creditors.
The reasons presented by the City for the practice are by no means compelling. While the policy choice to pay judgments under $1,000 before paying judgments over $1,000 may not be a civics textbook example of good government, this court does not judge governmental actions by that standard. A governmental classification that does not affect a suspect class or fundamental right must be upheld "unless no reasonably conceivable set of facts could establish a rational relationship between the classification and an arguably legitimate end of government." Nowak, Rotunda, Young, Constitutional Law (2d ed.1983). Government must be given wide latitude in these types of regulations. City of Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254; Vaden, 809 F.2d at 365. If a governmental decision is improvident, the political process and not the court has the responsibility for rectifying any error. City of Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254.
Under this extremely deferential standard, it is clear that the classification system set up by the City should not be struck down by this court. The City offered a number of reasons for its classification system. Most importantly, at the second trial the City argued that paying off smaller judgments early satisfied more claimants; without such a bifurcation of payments, all tort judgment creditors would have experienced lengthy delays. The district court found that the purpose of satisfying more claimants was invalid. However, we find nothing to indicate that such a goal is impermissible.[4] The purpose behind a governmental enactment need not be laudatoryto pass constitutional muster, the purpose must simply be legitimate. If the court can hypothesize plausible reasons for legislation that are within the legitimate goals of a government, nothing else is required to validate the government classification and it does not matter whether the reasons advanced actually motivated the legislative action.[5]United States R.R. Retirement *61 Bd. [v]. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Vicious or irrational discrimination violates the equal protection clause. Jackson v. City of Joliet, 715 F.2d 1200, 1203 (7th Cir.1983), cert. denied, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). No such discrimination is evident in this case. At worst, the City is merely attempting to satisfy as many individual claimants as possible with the limited revenues that are available. The City's practice of paying small tort judgments in advance of larger ones does not violate the equal protection rights of the holders of large tort judgments.... [Emphasis added; pages 1015-1016]
* * * *
Under this standard, the City's budgetary scheme does bear some rational relationship to legitimate state ends. The City's practice of charging judgments incurred by enterprise funds to those funds seems rationally related to the concept of such a funda self-sustaining or break-even operation supported by its users. Charging departmental budgets for contract damages conforms to the normal accounting practice of matching expenditures to the appropriate entity that incurred the liability. Similar rational reasons exist for charging personnel damages to the involved department. The 395 Fund is by law a special revenue fund and can only be used for its defined purpose....
It is not this court's province to prescribe the budgetary workings of the city of Chicago. Such things are beyond the expertise of the judiciary. San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). While it may have been more logical, as the district court pointed out, to charge all judgments back to the responsible departments, the City's lack of symmetry in its policy does not constitute an equal protection violation. See Dandridge v. Williams, 397 U.S. 471, 485-86, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491(1970) (failure of state to make perfect classifications not equal protection violation). [Page 1017]
When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude. City of Cleburne, supra. The Constitution presumes that even improvident decisions will eventually be rectified by the democratic process. Id. Where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how and to what extent those interests should be pursued. Id., 105 S.Ct. at 3255. In such cases, the Equal Protection Clause requires only a rational means serve a legitimate end. Id.
The School Board adopted "Regulations Implementing Board Policy No. 3511.5.R" dated July 8, 1996, relative to the payment of legal claims. This regulation established a hierarchy or priority system for the payment of state court tort claims and judgments. Exempt from the regulation are federal court judgments, worker's compensation judgments and non-litigated claims. The effect of this exemption is that federal court judgments and worker's compensation claims are paid in preference to all claims subject to the *62 regulation. We find a reasonable basis for each of these classifications rationally related to a legitimate interest of the School Board. The preference given to the payment of federal court judgments recognizes that more effective enforcement mechanisms are available for the execution of those judgments relative to state court judgments. The payment of worker's compensation judgments is mandated by Louisiana law. Accordingly, the preference given federal court judgments and worker's compensation claims over state court claims does not violate plaintiffs' Equal Protection rights.
Also exempt from the payment regulation are "claims arising out of or related to bodily or emotional injuries in which the claimant accepts, and the Superintendent recommends, payment of reasonable and necessary medical expenses and/or documented out-of-pocket expenses in full satisfaction of his or her claim." This category of claimants who are to be paid in preference to those subject to the payment regulation serves the dual legitimate interests of avoiding the burdens and expense of litigation and of avoiding the infliction of additional hardship on those who have medical needs and/or may be forced to bear the burden of out-of-pocket expenses.
The School Board's Regulation 3511.5R for the payment of claims defines "resolved claims" as state court personal injury claims reduced to final judgment or where a negotiated settlement has been approved by the School Board. Regulation 3511.5R first ranks "resolved claims" based on date of resolution, which in this case would be based on the January 24, 1997 date on which the Louisiana Supreme Court denied the School Board's writ application and the plaintiffs' judgment became final. Then the regulation provides that the "resolved claims" may improve their rank by agreeing to discounts in increments of five percent. In other words, all judgments agreeing to a discount of ten percent would be given priority over judgments agreeing to only a five percent discount, or no discount at all. We infer that judgments within discount categories would be satisfied in order of date of resolution. Even judgment creditors holding judgments against non-governmental judgment debtors will sometimes discount their judgments if it facilitates quick payment. It is in the legitimate interest of the School Board to negotiate the best settlements and judgment discounts possible. The School Board's judgment creditors have no incentive to discount other than that of speeding up collection. And those same judgment creditors have no incentive to discount 10% if they are not paid in preference to those who discount only 5%. Each plaintiff is allowed to determine their own level of discount based on their relative urgency of collection. The discount means that more plaintiffs will receive something in any given year. Both the School Board and its claimants can be said to benefit from this method of allocation of insufficient funds. We cannot say that there is no rational basis for the discount categorizations related to legitimate government objectives.
The plaintiffs argue that the School Board payment practices can not be justified on an economic basis because "the policy allows judgments that accrue interest at a rate higher than the discounts on some judgments." This argument fails to take into account the fact that as long as the School Board is unable or unwilling to pay all of its claims, there will always be legal interest accruing on one judgment or another. In other words, plaintiffs' argument fails to take into account the zero sum nature of the claims payment fund, i.e., if the payment of the plaintiffs' judgment will result in the cessation of interest on that judgment, then other judgments that have gone unpaid in order that the plaintiffs' judgments might be satisfied, will continue to accrue legal interest that would otherwise have not accrued had they been paid instead of plaintiffs.
Generally, the School Board is to pay only such claims as can be satisfied in full. *63 However, the regulation provides for the partial satisfaction of resolved claims exceeding $250,000 over multiple years. It is into this last category that the plaintiffs' judgment falls. Although it is not clear from the record, it appears that the plaintiffs by the time of oral argument had already received substantial payments on their judgment, apparently in excess of $1,000,000, in addition to whatever the plaintiffs received in settlement from all other defendants. Plaintiffs' brief complains that the judgment has not been paid in full, not that nothing has been paid on the judgment.
We can see a rational basis for generally paying claims in full. It should reduce administrative costs, as the file can then be closed on each fully satisfied claim. Moreover, to the extent that it may be said that it is irrational for Regulation 3511.5R to permit the partial payment of judgments over $250,000, such irrationality only benefits the Coopers. The Coopers do not deny that they have received substantial partial payments, whereas they would probably have received nothing on an all or nothing payment basis.
In addition to the payment regulation, 3511.R, the School Board employs Crawford and Company as a third party administrator with authority to settle, resolve or pay claims up to $7,500, plus medicals up to another $7,500. This procedure provides an efficient and economical means of disposing of these claims, i.e., we find a rational basis exists for treating claims in the category dealt with by Crawford and Company differently from claims falling outside the purview of Crawford and Company's scope of authority, including the Cooper judgment.
The Coopers do not fall into any suspect class and no fundamental right is involved. Therefore, the practice of the School Board is presumed to be valid and will be sustained as long as the classifications drawn are rationally related to a legitimate interest of the School Board as a governmental entity.
The classification system does put pressure on certain categories of creditors to settle and/or discount their claims. There is always more pressure on those who need fast payment. That is not an Equal Protection issue. The difficulties of collecting a judgment quickly and in full, as well as the need for immediate payment, are factors universally considered by plaintiffs when contemplating settlement options. The difference in this case is one of degree only, i.e., collection problems are not unique to this case, but the typical problems involved with collecting judgments against private defendants are aggravated in the instant case by plaintiffs' inability to execute its judgment against the School Board as a public entity.
Moreover, there is nothing unconstitutional about using the difficulty of collecting a claim as a negotiating tool. As it is common practice with private obligors, we find no basis why public obligors should be denied the same right. Just as private entities should be free to negotiate settlements and judgment discounts, public entities must be free to do likewise.
But because of the inability to levy against public entities, we do see the potential for abuse in the form of an attitude on the part of a public entity that could be described as: "You'll collect your judgment if, as, and when we feel like paying, if ever, maybe never, unless you agree to a settlement or discount entirely on our terms."[6] When one considers that in *64 cases such as this, the judgment creditor is part of the very class that the public entity was set up to serve, such an attitude would be less than commendable, an understatement commensurate with the dignity and restraint expected of the judicial system. However, in the absence of a clear-cut Equal Protection violation the courts of this state are virtually powerless in the face of the Constitutional prohibition against the seizure of public entity property to redress such abuses.
In the words of Baudoin v. Acadia Parish Police Jury, 96-1288, p. 10-11 (La.App. 3 Cir. 9/17/97); 702 So.2d 715, 720, writ den. 97-2546 (La.12/19/97); 706 So.2d 458.
The unfortunate thing ... is that the [political subdivision] can be arbitrary and get away with it. It is the nature of separation of powers that there is a line we cannot cross.... The [political subdivision] defended the law suit that resulted in the judgment, and undoubtedly disagreed with our decision. Disagreeing with it is one thing; not respecting it is another. If the [political subdivision] is refusing to pay this judgment arbitrarily, it is not showing respect for our judgment. If the Golden Rule applies in separation of powers, the [political subdivision] is not playing by the Rule if it disrespects our judgment arbitrarily. It owes this judgment. If it lacks the money and has no reasonable means of acquiring the money to pay this debt, that's something else. But if it has the money or can reasonably acquire the money to pay, it should do so and thereby set an example like most people do and are morally required to doit should pay its debt.
See also Guinn v. Rapides Parish Police Jury, 97-1519 (La.App. 3 Cir. 4/1/98); 708 So.2d 835, 838, writ den. 98-1113 (La.6/5/98, 720 So.2d 685), which relies on and quotes from Baudoin. This Court has no general authority to order the School Board to pay Coopers' judgment in preference to any other indebtedness. Nor does this Court have any authority to order taxing authorities to raise sufficient revenues to fund judgments.
Plaintiffs contend that the School Board's payment policy put unequal pressure on the poor to settle their claims for less than they are worth because they do not have the economic resources to fight the School Board and are also under disproportionately greater need to receive quick payment. The poor may have pressing bills just to pay for necessities and cannot afford to wait to maximize on their claims.
The mere fact that the poor are at a relative disadvantage and are thereby effectively deprived of some privileges is not enough to demonstrate an Equal Protection violation. Shultz v. Heyison, 439 F.Supp. 857, 860 (M.D.Pa. 1975). Additionally, there is nothing in the record to indicate that the plaintiffs are poor. The fact that the School Board's claims paying practices may be unconstitutional as to others who are poor is not sufficient to sustain plaintiffs' case. Plaintiffs must show that the actions of the School Board are unconstitutional as applied to them, just as a person to whom a statute may be applied constitutionally does not have standing to question the constitutionality of the statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); State v. Sandifer, 95-2226 (La.9/5/96); 679 So.2d 1324; State v. Norfleet, 96-2122, p. 9 (La.App. 4 Cir. 10/21/98); 721 So.2d 506, 511.
There is no constitutional right to be paid in the order causes of action arise or judgments become final. That is not the criteria by which judgments against private individuals are paid and it is not *65 a violation of Equal Protection that the judgments against the School Board are not paid in that order. It is only a violation of plaintiffs' Equal Protection rights if judgments that cannot be differentiated from plaintiffs' judgment on the basis of a reasonable classification rationally related to a legitimate state interest are paid in preference to their judgment. For example, if the sole basis for the payment of judgments were to be the date on which they became final; and if judgments which became final after the Cooper judgment became final were to be paid in preference to the Cooper judgment, that would be a violation of Cooper's right to Equal Protection. Likewise the payment of judgments in alphabetical order might fail an Equal Protection test because classification by alphabetical order might not be rationally related to the advancement of any legitimate state interest.
The plaintiffs contend that the preferences given by the School Board to those who settle has "the practical effect" of defeating their U.S. Const., art. 4, § 2, cl.1 right of access to the courts, citing Ryland v. Shapiro, 708 F.2d 967 (5 Cir.1983). In Ryland a District Attorney and his Assistant allegedly conspired under the color of state law to cover up a murder by having it listed as a suicide, thereby depriving the parents of the victim of their right to pursue their wrongful death claim in state court. We see no analogy between the facts of the instant case and those of Ryland.
The plaintiffs seek an injunction preventing the School Board from "incurring any indebtedness which purports to be superior in rank to Cooper's judgment against the School Board which became final in January 1997, until such time as said judgment shall have been satisfied in full." The prayer in plaintiffs' brief elaborates further by requesting that the School Board be specifically enjoined from making any post judgment payments of principal and interest on any other indebtedness and "from drawing upon any indebtedness which may heretofore have been authorized by the Louisiana Bond Commission" until their judgment has been paid. As the trial judge noted, such relief is, in effect, an order to pay the judgment contrary to Article 12, § 10 of the Louisiana Constitution. The School Board cannot operate without incurring debt. It is indebted for everything it purchases. It is indebted to teachers for their compensation. It is indebted to everyone who maintains the schools. The relief requested by the plaintiffs would require that they be paid before teachers, before maintenance, and before the schools could be operated. La. Const. Art. 12, § 10 was designed to prevent this.

Alleged violations of the Louisiana Local Government Budget Act, LSA-R.S. 39:1301, et seq., LSA-R.S. 17:88, and School Board budgetary policies and regulations.
The substance of this portion of plaintiffs' complaint is that in August of 1994 over $10 million was taken from the General Liability Fund where it would have been used to satisfy claims, including that of the plaintiffs, and used to pay health claims instead. Plaintiffs contend that such a transaction required approval of the School Board in the form of a budget amendment, and the School Board was not informed of the removal of the money from the General Liability Fund. Plaintiffs contend that the failure to inform the School Board of the transaction and the consequent failure of the School Board to amend its budget, constitute a violation of the Local Government Budget Act (LSA-R.S. 39:1301, et seq.), LSA-R.S. 17:88, as well as School Board budget policies and regulations. After a painstaking review of the record, we conclude, for reasons that we will discuss in great detail below, that the General Liability Fund is part of the Internal Service Fund which in turn is part of the Proprietary Fund, not the General Fund, and is therefore not *66 covered by either the Local Government Budget Act nor LSA-R.S. 17:88.
The Louisiana Local Government Budget Act, LSA-R.S. 39:1301 et seq., applies to political subdivisions of the state such as the Orleans Parish School Board "with a general fund or special revenue fund."[7] LSA-R.S. 39:1314 B provides that:
Any person may commence a suit in a court of competent jurisdiction for the parish in which the political subdivision is domiciled for mandamus, injunctive, or declaratory relief to require compliance with the provisions of this Chapter.
Such political subdivisions having proposed expenditures totaling $250,000.00 or more in either the general fund or a special revenue fund are required to prepare a budget.[8] Among the items to be set forth in the budget document are:[9]
A statement for the general fund, each special revenue fund, [and any other fund,][10] showing the estimated fund balances at the beginning of the year; estimates of all receipts and revenues to be received, revenues itemized by source; recommended expenditures itemized by agency, department, function, and character; and estimated fund balances at the end of the year.
The School Board is required by LSA-R.S. 39:1304 D to have a "budget adoption instrument" which:
shall define the authority of the chief executive and administration officers of the political subdivision to make changes within various budget classifications without approval by the governing authority, as well as those powers reserved solely to the governing authority.
This authority is limited by LSA-R.S. 39:1304 E:
The total of proposed expenditures shall not exceed the total of estimated funds available for the ensuing year.
LSA-R.S. 39:1309 requires that the budget be amended when under LSA-39:1310 A any of the following occur:
(1) Total revenue and other sources plus projected revenue and other sources for the remainder of the year, within a fund, are failing to meet total budgeted revenues and other sources by five per cent[11] or more.
(2) Total actual expenditures and other uses plus projected expenditures and other uses for the remainder of the year, within a fund, are exceeding the total budgeted expenditures and other uses by five percent or more.

*67 (3) Actual beginning fund balance, within a fund, fails to meet estimated beginning fund balance by five percent or more and fund balance is being used to fund current year expenditures.
In view of our interpretation of LSA-R.S. 39:1304 C(2), we find that all of the references in LSA-R.S. 13:1310 A to "fund" are in fact references to "general funds" and "special revenue funds."
If the argument of the plaintiffs is that the General Liability Fund is part of the General Fund (as the trial judge found it to be) and that a deficit in the General Liability Fund is a deficit in the General Fund that must not be permitted to exist under LSA-1304 E, then the constitutional exemption from seizure of School Board funds and property would become meaningless because the School Board would always have to fund all judgments in order to balance the budget. This would have the effect of giving judgments priority over school operations. The constitutional prohibition against the seizure of School Board funds or other property represents a policy decision that the public interest shall be paramount to the interest of the private injured judgment creditor  a decision that one should suffer rather than many  cold comfort if you happen to be the injured "one." As long as tort victims are prevented from levying against School Board property, and as long as the courts are powerless to order that sufficient taxes be raised to simultaneously fund school operations and all judgments in full, plaintiffs will remain second class citizens in the world of judgment creditors. We conclude, as did the trial judge, that the Local Government Budget Act does not mandate the funding of tort judgments.
LSA-R.S. 17:88 A requires that "[e]ach city and parish school board ... adopt ... a budget for the general fund and each special revenue fund ..." LSA-R.S. 17:88 B requires that expenditures not exceed beginning fund balance, revenues and cash balances. LSA-R.S. 17:88 B goes on to state that:
If, during the course of the fiscal year, it becomes evident that receipts or disbursements will vary substantially from those budgeted, then the school board shall prepare and adopt, in like form, manner and substance and upon like penalties, an amended budget or revenues, expenses and disbursements.
The reference in LSA-R.S. 17:88 B to a variance from budget applies to the School Board General fund and Special Revenue Fund only. It does not apply to a deviation from projections in the Proprietary Fund as that fund is not "budgeted" in the statutory sense.
Mr. Kent Berger testified as the plaintiffs' accounting expert. He had no public entities as clients and had never conducted any audits of public entities. He acknowledged that the accounting profession uses Generally Accepted Accounting Principles (GAAP) for private entities, but that Governmental Accounting Standards are used for governmental entities, such as the School Board. He admitted to being unfamiliar with Governmental Accounting Standards. He did not know if the main purpose of an audit of a governmental entity was to determine (as it is for a private entity) whether the financial statements of the governmental entity are presented fairly in all material respects.
Mr. Berger did not look at the School Board transactions that are the subject of this suit. He did not review the budget or the Comprehensive Annual Financial Reports. He reviewed only the deposition testimony of Mr. James Henderson (Chief Financial Officer for the Orleans Parish School Board from May of 1990 until July of 1997) in order to express an opinion on how that testimony could be related to the Local Government Budget Act, LSA-R.S. 17:88 and School Board Budget Policy. We find that Mr. Berger's testimony adds nothing to that given by Mr. Henderson. Mr. Berger expresses no opinion as to whether he would agree or disagree with *68 any of the statements made in the Henderson deposition germane to the issues of this case. Mr. Berger merely repeats in his own words what Mr. Henderson said. We do not see that any accounting expertise was required to give the testimony given by Mr. Berger, which appears to be the rankest hearsay and merely cumulative and redundant of what Mr. Henderson expressed.
Mr. Berger did not testify that he himself found a violation of law or policy. He did not say that the General Liability Fund is part of the General Fund and he did not interpret Mr. Henderson's testimony to say that.
Mr. Berger testified as follows:
Basically what the School Board's policy is that if there is a three percent variance in expenditures between that which was budgeted and that which is to be expended, that there needs to be an amended budget adopted, and that amended budget should conform to the Local Budget Act and the regulations cited therein.
* * * *
Based on Mr. Henderson's testimony, there appears to be an additional appropriation of approximately three million dollars from the General Fund to the Liability Fund.
Additionally, I believe his deposition says ten million dollars was transferred from the Liability Fund to the Health Insurance Fund. [Emphasis added.]
Plaintiffs' complaint is focused on this "ten million" dollar "transfer" from the Liability Fund to the Health Insurance Fund, not the "appropriation of approximately three million dollars from the General fund to the Liability Fund." This ten million dollars is the money that the plaintiffs believe would have been used to satisfy their judgment had it not been used to cover the shortfall in the Health Insurance Fund. As will be discussed in greater detail hereafter, the approximately three million dollar (actually $2.6 million) General Fund "appropriation" represents an "expenditure"[12] from the General Fund. Expenditures from the General Fund are covered by the Local Government Budget Act and LSA-R.S. 17:88. It is clear from the record, as will be discussed in greater detail hereafter, that the $2.6 million expenditure from the General Fund was reported to and approved by the School Board. But the "transfer" from the General Liability Fund to the Health Insurance Fund is not an expenditure of the General Fund covered by the statutory provisions. The General Liability Fund is not "budgeted" within the intendment of the statutes where "budget" is a term of art limited to the General Fund and Special Revenue Funds.
Mr. Berger testified that in order to reallocate money from one sub fund to another, he interpreted Mr. Henderson's testimony to mean that the Board would need to adopt an amended budget. Mr. Berger did not testify that there was ever a deficit in the General Fund or that he *69 interpreted Mr. Henderson's testimony to suggest that there was ever a deficit in the General Fund. When asked whether he knew what funds are covered by the Local Government Budget Act, Mr. Berger responded:
I believe it is the General fund, but other than that I am not sure.
When asked whether the transfers occurred in the General Fund, Mr. Berger responded:
A. Again, according to Mr. Henderson's testimony there were fundsthere were transfers from the General Fund to the Proprietary Fund, or the Liability Fund, and there were transfers from the Liability Fund to the Health Care, Health Insurance Fund. [Emphasis added.]
Q. Do you know whether or not any individual transferred during any given year resulting in a transfer from the General Fund to the Proprietary Fund in excess of three or five percent? [Sic.]
A. No, I do not.
Q. So, if you don't know that, sir, how can you determine that there has been a violation?
A. Because there was a fund. There was also a transfer from within the Proprietary Fund to another Proprietary fund, which I believe is in excess of the three or five percent standard.[13]
Q. But, you assume that there were two proprietary funds involved?
A. Based on Mr. Henderson's testimony there were three.
Q. If I told you, sir, those were accounts within a single fund, would that change your opinion?
A. [I]t would change my opinion as to whether there were transfers among the funds, but it would not change my opinion that Mr. Henderson testified that there was a violation of Board policy.
Q. What in Board policy did he violate, sir?
When Mr. Berger testified that he interpreted Mr. Henderson's testimony to mean that there was a transfer "from the General Fund to the Proprietary Fund, or the Liability fund," he, in effect, acknowledges that the Proprietary Fund is not the same as the General Fund. The trial judge in his reasons for judgment finds that the Proprietary Fund is part of the General Fund. The record does not support that finding. There is no testimony to that effect and all of the documentary evidence contradicts such a finding. As is pointed out in the uncontradicted testimony of Mr. Reginald Zeno, Orleans Parish School Board Regional Director of Budgets, discussed later in this opinion, the General Fund is not the sole source of funding for the proprietary fund. The General Fund also receives funding from the Special Revenue Fund.
But Mr. Berger was of the opinion that Mr. Henderson's deposition indicated a violation of Board policy based on the following testimony by Henderson:
Q. But when you did become aware of it, as you understand the budget policy, should the School Board have adopted an amended budget?
A. Yeah.
Q. And that was not done?
A. Well, it was after the fact.
Q. Well, the Board never, as I understand your prior testimony, the Board never voted on anything after this expenditure overrun occurred; is that true?
A. Yeah. I don't think they had anything for them to vote on, except to receive the financial statements.
When asked if the Board had violated something with respect to the General *70 Fund or a Special Revenue Fund, Mr. Berger responded:
I want to be careful how we say this. Again, my testimony was based on interpreting Mr. Henderson's testimony. The use of the proprietary fund is based on transfers from the general fund. It is not a fund whereby transfers should be made between each of the sub funds of the liability fund. The transfers should come, it is my understanding, from the general fund to fund any deficits in that proprietary fund, not by reallocating cash, if you will, or reserve, if you will, among the funds within that proprietary fund.
Mr. Berger expresses the opinion (based on his reading of Henderson's testimony) that a transfer within the Proprietary Fund is a violation of law. We find nothing in the Local Government Budget Act or in LSA-R.S. 17:88 to support this conclusion. Mr. Berger never states what law is violated. In interpreting Henderson's testimony, Berger did not conclude that the General Liability Fund was part of the General Fund. Instead, Berger testified that: "My understanding is that there were three funds, again, based on Mr. Henderson's testimony, and that is all I can go by." In making this statement, Berger must necessarily have been referring to the three funds within the self-insurance fund alluded to in the following testimony given by Henderson:
Q. All right. Is the general liability fund and health fund maintained as separate budget items with the  or was it at that time maintained as two separate budget items on the Board's budget?
A. Well, they weren't budget items, per se. They were independent funds, from an accounting standpoint, so they are separate. Well, in governmental accounting, assets, revenue and expenditures, as well as liabilities, are segregated into funds based on the intended use of the money. There is the general fund that takes care of the general operation of the district, and it has its own set of assets, liabilities; a set of balancing accounts, if you will. [Emphasis added.]
Q. Okay
A. And we had several other funds based on the purpose, but included was the self-insurance fund where we had three, primarily, three funds, included within the self-insurance fund. There was the health insurance fund. There was a life and dental insurance fund, and then there was the general liability fund, but each had its own set of assets, liabilities and fund balance reserves. [Emphasis added.]
Mr. Berger concluded that no amended budget was adopted to transfer the funds from the General Liability fund to the Health Insurance Fund, and that the Superintendent authorized the transfer, but that was based on his interpretation of Mr. Henderson's testimony to the effect that the transfers were not reflected in the quarterly reports. Mr. Berger did not testify that the Board could not make amendments to the budget via the adoption of quarterly reports reflecting the changes. More importantly, Mr. Henderson failed to take into account the Superintendent's authority consistent with LSA-39:1304D & E to move funds within line items. Because Mr. Berger's testimony was limited to restating Mr. Henderson's testimony, he naturally failed to consider the Superintendent's authority to move funds within line items.
Mr. Henderson testified that:
A. [W]e did not prepare a formal budget for public presentation and for board action for the entire self-insurance fund.
Q. What did you do?
A. It was only the contributions to the fund, from the general fund, which represented an expenditure in the general fund, and a revenue item in the self-insurance fund. [Emphasis added.]
*71 As may be seen by reference to the Consolidated Annual Financial Reports (CAFR) and the Proposed Consolidated Budget for fiscal year 1997-1998, as well as the other CAFRs in evidence there was no separate line item designating the contributions to the "self-insurance" fund. When Mr. Henderson testified that the contributions from the General Fund to the self-insurance fund were in the budget, he did not intend to say that they were represented by separate sacrosanct line items readily identifiable as such.
Mr. Henderson testified that there was a surplus in the General Fund balance as of June 30, 1994. Mr. Berger neither criticized nor contradicted Mr. Henderson's testimony on this point. In fact, no where in Mr. Berger's testimony does he criticize or contradict anything said by Mr. Henderson.
Carl Coleman testified as the Director of Risk Management for the School Board. He was Senior Budget Analyst for the Board for three years before that. He testified that $2,000,000.00 was transferred from the General Fund to the General Liability Fund as reserve for the Cooper claim, but that that money was subsequently transferred to the Health Insurance fund to pay claims; that the reason for adopting Policy 3511.5 was to create stability; and that there was never any discussion of not paying the Cooper judgment. Moreover, establishing and/or earmarking reserves is not authorization for payment and it does not represent an appropriation of those funds to the purpose for which they are reserved. That is done on a case by case basis by formal School Board action at a public meeting.
When asked what differences might have been put into effect between 1996 and 1997 in the manner in which the School board allocated money for the payment of judgments, Mr. Coleman responded:
The differences that [sic] the general liability reserves that were used to pay the expenditures and health insurance created red ink for general liability tort claims and that red ink was carried in the same fashion in the insurance fund account company 50[sic] as per external auditor's recommendation that money has been, or that accounting purpose has been transferred from there in to a long term debt.
Morris Holmes testified as Superintendent of the New Orleans Public Schools. He testified that:
The insurance is proprietary budget that indeed can carry a deficit while the general fund does not have one, because the general fund cannot carry a deficit by state law. And, the budget accounts, namely health insurance and general liability fund, run deficits all the time, and all public bodies, while the general fund is balance, or indeed at any given point in time a general fund balance may have surplus on the books for accounting purposes. [Sic.]
Mr. Holmes went on to testify that the General Liability Fund is:
[O]ne of the accounts in the insurance proprietary fund. It is one of the accounts in the insurance proprietary fund.
He stated that teachers' salaries are paid out of the General Fund budget, the operating budget for the total operation of the school.
Reginald Zeno testified as Orleans Parish School Board Regional Director of Budgets. As such he is responsible for the preparation and monitoring of the District's budgets, the General Fund, Special Revenue Funds, and capital projects budget. He is also responsible for interim reporting, quarterly reports submitted to the Board. Mr. Zeno described the General Fund as the "fund that basically the District operates out of." He described the Special Revenue Fund as the "fund where we account for revenues received from external sources for specific purposes, such as federally funded programs." Mr. Zeno described the Proprietary Fund as follows:

*72 A. The proprietary fund is where we account for the accumulation of resources that are used for employee benefits. Included in the proprietary fund is what is called the internal service fund, and within the internal service fund is where the District accounts for several programs, such as the health insurance program, the dental version, and life program, worker's compensation program, the general liability program, and many of the insurance programs that are funded throughout the District.
Q. Are those established as separate funds within the internal service fund? A. Those are established as separate programs within the internal service fund?
BY THE COURT:
What distinction are you making between fund and program?
A. Program is basically the activity that is operated or accounted for within the concept of internal service fund. Within government accounting you have the government funds, which is primarily the general fund, and in addition to the government funds you have proprietary type funds, and a component of the proprietary type fund is the insurance fund, and within that fund would be the various activities that were in effect setting up separate accounts for within that fund type.
BY THE COURT:
What is the source of the general fund?
A. Various sources, state minimum foundation program, as well as some of the local sources, sales and property taxes.
BY THE COURT:
What are the sources of the funds in the proprietary fund?
BY THE WITNESS:
The sources of the funds within the proprietary fund are accounted for within the other government fund types.
BY THE COURT:
So, what you are saying, the source of money in the proprietary funds are the same as those for the general fund.
BY THE WITNESS:
That is correct, as well as the resources regenerated from the special revenue fund that are accumulated within the proprietary fund.[14]
BY THE COURT:
What is the source from the special?
BY THE WITNESS:
Those are specific in most cases, specific grants that are received from various funding agencies, the federal government for special entitlement programs, such as the Title I program, basically the various grants that are received by the District through some process.
BY THE COURT:
And, those funds are subject to restrictions imposed by the grantor, whereas the general funds are not subject to restrictions placed on it by the third partysome third party?
BY THE WITNESS:
That is correct?
FURTHER EXAMINATION BY MR. ENDOM:
Q. Now, how is it in the ordinary course of a year prior to fiscal year ending 1994 funds were transferred to the proprietary funds, particularly the internal service fund that you described a minute ago?
A. Prior to 1993/94 funds were budgeted within the general fund, as well as within the special revenue fund to be transferred over to the proprietary fund for several activities, such as health insurance, general liability, activities for legal cost for premiums associated with the various general liability premiums, as well as worker's compensation, and some of the other benefits that are afforded to lawyers.
*73 Mr. Zeno testified that funds were disbursed from the self insurance fund for the payment of judgments and for general liability claims "based on specific authorization by the School Board." All of Mr. Zeno's testimony is borne out by the Comprehensive Annual Financial Reports (CAFRs) offered into evidence.
Mr. Zeno testified that the quarterly reports represented the formal revision of the budget for the School Board. The external auditor provides opinions on whether the District has adhered to all federal and state laws. No violations of federal or state law were noted by the external auditor in connection with the Comprehensive Annual Report for the School Board for June 30, 1994. At no time was there a transfer of three percent or more of the General Fund outside of the budget process. The CAFR for the fiscal year ending June 30, 1995, reflects School Board authorization of the transfer from the General Fund of $2.6 million to the Proprietary Fund to help cover the deficit in the health insurance program through the Board's approval of the financial statements.
Mr. Zeno's testimony also supports the School Board's position concerning the nature of the Proprietary Fund:
Q. Does the health insurance account have its own health insurance account checking account?
A. No.
Q. How are the checks drawn on the health insurance account?
A. It is drawn from one account.
Q. What account is that.
A. The proprietary fund account.
Q. Is that how the health fund, the legal fund for the general liability fund that pays legal claims? That is within the self insurance account as well, correct?
A. That is within the proprietary fund.
Q. The legal account, the legal claims account, doesn't generate any money of its own, does it?
A. Well, it generates transfers. It is funded through transfers from the general fund and the special revenue fund.
Q. So, legal fundthe legal fund and the general liability fund is funded by transfers from the general fund?
A. And the special revenue fund.
Mr. Zeno testified that the Board adopts the quarterly reports at public meetings after the agenda is advertised. Ms. Gail Glapion testified as a member of the School Board since 1985. She was not asked about the general fund versus the general liability fund. She testified only that the Board policy for paying claims was a response to unforeseen financial hardships based on the overriding consideration of educating children.
Albert J. Richard, III, C.P.A.,[15] testified for the School Board as an expert in accounting for public entities. He is the engagement partner with K.P.M.G., Peate, Marwick, the external auditors for the School Board. He testified that if there had been non-compliance with budgetary laws or regulations they would have been reported by the external auditors. Mr. Richard testified that the Local Government Budget Act applies to general funds and to special revenue funds. When asked about proprietary funds he testified that:
Proprietary funds are broken up into two. There are two types of proprietary funds. There is your internal service funds, which are activities that are conducted by the organization that are accounted for in its own fund because they bill out to other departments within the organization....
They also have insurance funds. These are internal service funds.
*74 Mr. Richard testified that there were no exceptions noted regarding "the interchange between the general fund and the proprietary fund, particularly the insurance account and among the various accounts in the proprietary fund." The audits from 1994 forward noted no exceptions relative to the Board policy and regulation concerning the adoption of budgets and modification of budgets as regards health care claims. Mr. Richard testified that the health fund and the general liability fund were separate funds, both self insurance funds. Mr. Richard opined that the Board should authorize transfers between those funds.
BY THE COURT:
You don't consider it an irregularity if the administrators transfer the money first and then after they have made the transfer and so forth, they go back and get Board ratification? You don't regard that as improper?
A. The transfers are approved by the Board on a quarterly basis. Then they would get approval. If it was after the fact the entry would stand. If it was not after the fact the entry would not stand.
In this instance Mr. Richard believed that the staff transferred the funds and then bought the transfer to the Board for approval. Mr. Richard said that a transfer between internal service funds might not be a violation of the Board's regulations for budget procedure because the Board has no written procedures prescribing how transfers between internal service funds are to be made. No one has produced any written regulations of the School Board to the contrary. There is nothing to support Mr. Henderson's suggestion that the School Policy requires School Board prior approval of transfers between internal service funds, i.e., within one line item. To the contrary, the CAFRs contain documentary evidence that the Superintendent has the authority to make such transfers. However, the fact that we find that the Superintendent has the authority to make certain transfers is not a finding that he does not have to report such transfers to the School Board in an appropriate manner.
Mr. Richard testified that: "Internal service funds do not have budgets." He went on to testify that:
A. If you had a deficit it could be [funded] through appropriation from the general fund. I don't believe that it would have to be. The reason that I would say that is because other internal service funds could have excess equity that could be transferred to cover the deficit.
* * * *
Q. Is it your testimony then that the School Board budgetary regulations don't require that deficits in any operating fund be satisfied first by an appropriation from the general fund?
A. I don't believe the internal service funds are subject to the budget regulations.
All of Mr. Richard's testimony is supported by the CAFRs and is consistent with the Local Government Budget Act.
The establishment of reserves to pay a claim is not an appropriation. The appropriation occurs when the Board specifically authorizes payment. The designating or earmarking of funds does not constitute an appropriation.
The Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 1994 was issued on October 5, 1994, prior to the judgment in the Cooper case. It contains an "Independent Auditor's Report" dated October 5, 1994 which states that the audit included assessing the accounting principles used:
The combining, individual fund, and individual account group financial statements and schedules listed in the accompanying table of contents are presented for purposes of additional analysis and are not a required part of the general purpose financial statements and of the *75 Orleans Parish School Board. Such information has been subjected to the auditing procedures applied in the audit of the general purpose financial statements and, in our opinion, is fairly presented in all material respects in relation to the general purpose financial statements taken as a whole.
The "Governmental Fund Types" section of the "Notes to General Purpose Financial Statements" of the CAFR explains in pertinent part that:
General Fund expenditures represent the costs of general school system operations and include functional categories of instructional and support services. The General Fund is used to account for all financial resources and expenditures except those required to be accounted for in another fund. [Emphasis added.]
The title page of the General Fund section of the 1995 CAFR describe the General Fund expenditures as follows:
General Fund expenditures represent the costs of general school system operations and include the functional categories of Instructional and Support Services. Classifications within Support Services include:
Pupil Support
Instructional Staff Support
General Administration
School Administration
Business Administration
Business Administration costs reflect the expenditures incurred for pupil transportation, fringe benefits (including retirement contributions), revenue collection fees, business, maintenance and central services (including insurance claims and judgments). [Emphasis added.]
The "Budgetary Data" section of the "Notes to General Purpose Financial Statements" of the CAFR explains that:
The School Board employs the following procedures in establishing the budgetary data recorded in the general purpose financial statements:
1. Annually, the Superintendent of Schools submits to the School Board a proposed annual budget of expected revenues and expenditures for the General Fund and Special Revenue Funds. Legally adopted budgets are only required for the General Fund and the Special Revenue Funds.... [Emphasis added.]
2. A public hearing is advertised and conducted to obtain public input and the proposed budgets are published.
3. The budget is adopted by the School Board ...
4. The Superintendent is authorized to move budgeted items within line items in the District's approved General Fund Budget but he (she) may not increase the total amount authorized. If during the course of the fiscal year, it becomes evident that estimated revenues, expenditures or beginning fund balance may vary substantially (3%) from the amounts budgeted, then the Superintendent shall inform the Board of the shortfall. Based on the information submitted, the School Board will adopt an amended budget according to the procedures set forth by the State Legislature in R.S. 39:1309 and 1310, and send a copy of the revision to the Louisiana Superintendent of Education. Other budget revisions are submitted to the School Board for approval on a quarterly basis.[16] [Emphasis added.]

* * * *
All budget amounts presented in the general purpose financial statements *76 have been adjusted for legally authorized revisions of the annual budgets incorporated into interim financial reports presented to the School Board. No legal restrictions, other than those mentioned previously, are placed on the General Fund budget.
The "Combined Statement of Revenues, Expenditures, and Changes in Fund Balances  Budget and Actual  General and Special Revenue Fund Types (Note 2(c))" bears out the fact that there is no formal or statutory budget for the "Proprietary Fund/Internal Service Fund." This schedule comparing the actual figures to those budgeted shows the "Business administration" line item containing health insurance and general liability claims and judgements, but the figures for health insurance and general liability are not broken out from the "Business administration" line item. The policy of the School Board as described previously allows the Superintendent of Schools to move items within line items as long as he doesn't increase "the total amount authorized." As both health insurance and general liability fall within the same line item, "Business Administration," Superintendent Holmes violated no School Board Policy in making the transfer from the General Liability Fund to pay health claims as he did not increase the total amount authorized for the "Business Administration" line item. However, Mr. Henderson did express the opinion that it was School Board policy to report such actions and he was of the opinion that this was not done. Although there is no evidence in the record concerning the precise nature of such a policy, it is inconceivable to this Court that the Superintendent could make a transfer in excess of $10 million and not report that fact to the Board. Therefore, common sense supports a finding that such a policy must exist in accordance with Mr. Henderson's testimony. Furthermore, we do not believe that such a policy can be satisfied by merely imbedding the $10 million in some obscure accounting entry furnished to the Board in the form of a Quarterly Report, etc.
The "Combined Balance Sheet  All Funds Types and Account Groups" shows a category described as "Proprietary Fund Type-Internal Service." The same category appears in a schedule entitled, "Combined Statement of Revenues, Expenses, and Changes in retained Earnings (Accumulated Deficit)/ fund Balances  All Proprietary Fund Types and Nonexpendable Trust Fund." The only "proprietary fund" shown on this schedule is again designated "Internal Service" and again it shows a deficit of $4,784,439.00. The "Summary of significant Accounting Policies" states that:
The Proprietary Fund is used to account for the School Board's ongoing organizations and activities which are similar to those often found in the private sector.... The School Board's proprietary fund type is limited to Internal Service Funds as follows: [Emphasis added.]

Internal Service Funds  Self-insurance Funds and Print Shop Fund  The internal Service Funds are used to account for the accumulation of resources for and the payment of benefits by the School Board' self-insurance programs and to report revenues and expenses of the School Board' Print Shop. The School Board maintains the following self-insurance funds:"
The report then lists and describes the "Health Insurance Fund", the "Life, Dental and Optical Insurance Fund", the "Worker's Compensation Fund", and the "Other Insurance Fund." The "Other Insurance Fund" which is the fund relevant to the instant case is described thus:
This fund is used to account for all other insurance programs maintained by the School Board. The significant programs of this fund consist of the following property and liability insurance types: (1) general liability  which through April 30, 1994 was self-insured with unlimited liability; effective *77 May 1, 1994 insurance coverage was obtained for future claims exceeding $500,000.00; (2) fleet insurance, which is fully insured with physical damage having an aggregate deductible of $250,000 per occurrence; (3) fire insurance, which is fully insured with a deductible of $500,000 per occurrence; and (4) flood insurance, which is fully insured with a cumulative deductible of $15,000 per occurrence. [Emphasis added.]
Later in the CAFR is an entire section entitled, "Proprietary Funds." The subtitle of this section is once again: "Proprietary Service FundsSelf-Insurance Funds and Print Shop Fund." The following explanation is given:
Internal Service Funds are used to account for and the payment of benefits by the School Board's self-insurance program and the revenues and expenses of the Print Shop.
In a section of the CAFR entitled "Claims and Judgments" the report states that:
The School Board provides for losses resulting from claims and judgments. Liability for such losses is recorded in the Internal Service Fund  Self-insurance Funds. Incurred but not reported claims as of June 30, 1994, have been considered in determining the accrued liability.
The CAFR received a "Certificate of Achievement for Excellence in Financial Reporting" from the Governmental Finance Officers Association of the United States and Canada. The CAFR received a similar certificate from the Association of School Business Officials International. We find the CAFR to be credible.
The CAFRs for other years consistently describe the Proprietary Funds type in the same manner.
From our analysis of the record we conclude that there is no evidence that the General Liability Fund must conform to the Local Government Budget Act or to LSA-R.S. 17:88. Although funding for general liabilities may come out of the General Fund, that does not mean that the General Liability Fund is treated as a General Fund for purposes of the Local Government Budget Act and LSA-R.S. 17:88. Accordingly, shortfalls in the Health Insurance Account or the General Liability Fund do not represent "budget" shortfalls or deficits within the intendment of the Local Government Budget and LSA-R.S. 17:88. Therefore, when the trial judge concludes in his discussion of the General Liability Fund and the Health Insurance Fund that "budget shortfalls have occurred," he is in error as to fact and law in so far as he may be referring to the Local Government Budget Act and LSA-R.S. 17:88.
Where the trial judge states that "approximately $2.6 million is annually being paid from the proprietary fund to the general fund" he commits an error of fact. There is no evidence to support this statement. The CAFR for the fiscal year ending June 30, 1995 shows $1,300,000 being transferred into the Health Insurance account and a like amount being transferred into the Other Insurance account (both of which are part of the Proprietary Fund/Internal Service Fund), which, according to Mr. Zeno, came out of the general fund. This is confirmed by the statement in the CAFR concerning the transfer of $2.6 million from the General Fund.
None of the General Budget presentations shown in any of the CAFRs show either Health Insurance or the General Liability account as line items in the General Fund.
The trial judge in his written reasons states that:
The OPSB has classified the judgments against it as long term debt. The independent accountants for the OPSB, KPMP Peat Marwick/Bruno & Tervalon, believe that such debt is related to the health insurance fund, a true proprietary fund because premiums are paid *78 into the fund. The accountants are apparently in error.
The accountants are correct in the sense that all evidence supports the conclusion that both Health Insurance and General Liability are part of the Proprietary Fund/Internal Service Fund. Premiums are paid into the Health Insurance account, but it is also supported by contributions from the General Fund.
It is significant that the trial judge never says that he finds a violation of the Local Government Budget Act or LSA-R.S. 17:88. The only violation described by the trial judge in his written reasons is a violation of internal School Board policy:
Holmes became aware in 1994 that the health insurance fund faced a $13 million deficit yet he failed to notify the OPSB in writing of the problem, instead taking it upon himself to authorize the transfer of funds from the general liability fund to the health insurance fund. The changes were material to both funds and his transfer violated OPSB policy unless ratified by the OPSB. [Emphasis added.]
Any implication in the trial judge's opinion that a deviation of more than three or five percent from projections in the Health Insurance Fund or the General Liability Fund would be a violation of laws and regulations meant to apply to the General Fund or the Special Revenue Fund would be error.
After a painstaking review of all of the testimony and documentary evidence we have determined that the only reasonable inferences that can be drawn from the record as a whole are the following:
1. The General Liability Fund and the Health Insurance Fund are part of the Proprietary Fund/Internal Service Fund.
2. The Proprietary Fund/Internal Service Fund is not subject to the Local Government Budget Act and is not "budgeted" in the statutory sense.
3. A shortfall in the General Liability Fund or the Health Insurance Fund does not create a deficit in the General Fund within the intendment of the Local Government Budget Act and LSA-R.S. 17:88.
4. The funds budgeted from the General Fund to the General Liability Fund and the Health Insurance Fund are found in the "Business Administration" line on the General Fund budget, and represent an expenditure to the General Fund and revenue to the General Liability Fund.
5. The Superintendent's authority to move funds within line items gives him the authority to move funds from the General Liability Fund to the Health Insurance Fund within the same line item, as long as he does not increase the total amount authorized for that line item.
6. We find no evidence that the Superintendent ever informed the School Board in a meaningful manner of the transfer of over $10,000,000 from the General Liability Fund to the Health Insurance Fund.
7. Accordingly we find that the record as a whole will not support the finding of the trial court that the Superintendent moved the General Fund funds without authority. In the alternative, we find that in the event it is determined that the Superintendent did not have the authority to transfer the General Liability Funds to the Health Insurance Account, then we find that his action was subsequently ratified by the Board as is demonstrated by the June 5, 1995 CAFR. The only evidence from which contrary inferences may be drawn is Mr. Henderson's testimony[17] and we find that this is one of those instances where those inferences are so contradicted by the documentary evidence and the rest of the record, that the trial judge was clearly wrong in finding *79 that the transfer from the General Fund to the Health Insurance Fund was done in violation of School Board policy and without School Board approval.
We conclude that none of the School Board's activities complained of herein have violated any of the plaintiffs' constitutional rights; and none of the School Board's activities complained of herein violated the Local Government Budget Act or LSA-R.S. 17:88. However, we find nothing in the record that would lead us to believe that the trial court was wrong in concluding that the Superintendent never properly reported the transfer of over $10,000,000.00 from the General Liability Fund to the Health Insurance Fund. We believe that the relief ordered by the trial court on that issue is appropriate. We also believe that although it may have been stretching a point, the trial court remained within its broad discretion, even if barely so, in awarding costs to the plaintiffs, especially in view of the David and Goliath relationship of the litigants and the frustrating difficulties plaintiffs have encountered in seeking to collect their just and adjudicated claim. Unfortunately, we are powerless to do more for the plaintiffs at this time. However, this does not mean that the plaintiffs may not file another similar suit in the future if the School Board adopts new practices that might raise Equal Protection issues, or if with the passage of time it becomes clearer that the delay in payment to the plaintiffs relative to other judgment creditors becomes so disproportionate in practice (as opposed to theory) that it might raise an Equal Protection claim.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
MURRAY, J., CONCURS IN THE RESULT
NOTES
[1] Prior to trial, all other defendants settled, presumably for a fairly substantial amount of money.
[2] Plaintiffs contend that the La. Const. Art. I is construed more broadly than its federal counterpart, and is intended to give the citizens of Louisiana greater equal protection rights than those provided by the federal Fourteenth Amendment, citing Louisiana Associated General Contractors, Inc. v. State Division of Administration, 95-2105 (La. 3/8/96); 669 So.2d 1185. However, our reading of the Louisiana Associated General Contractors opinion leads us to conclude that the greater rights referred to by the plaintiffs are related to the treatment of classes that would be treated as "suspect" under the U.S. Fourteenth Amendment, but which would be "prohibited" classes under La. Const. Art. I. Id., p. 6, 669 So.2d at 1198. Plaintiffs do not contend that they are being discriminated against based on any "suspect" or "prohibited" class.
[3] School Board budget policies and regulations, not legislation, are at issue in the instant case. However, it is not disputed that such policies and regulations are legally analogous to legislation for Equal Protection purposes. See Griffin, supra, to the same effect. A broader, more generic term, such as "state action" or "governmental action", would probably be more appropriate.
[4] The same can be said of the way the payment regulation and policies of the School Board favor the disposition of many smaller claims.
[5] For example, in the instant case, the School Board contended that one of its motivations in adopting the payment policy of which the plaintiffs complain is the financial problem created when the $500,000 cap on tort claims against the School Board was declared unconstitutional. Although there are some unsubstantiated references in witness testimony to judgments in excess of $500,000 other than the Cooper judgment, the documentary evidence furnished by the School Board shows none. However, as this Court is able to "hypothesize plausible reasons ... that are within the legitimate goals" of the School Board as a governmental agency, "nothing else is required to validate" the School Board's method of classification. Evans, supra.
[6] Query: May a public entity clearly possessing the means to pay all judgments without impinging on the performance of any of its public functions refuse to pay all judgments (no Equal Protection violation there!), or is there some requirement of good faith implicit in the La. Const.Art. 12, § 10 prohibition against the seizure of public property, and/or may some other constitutional provision be invoked to compel payment at that point? Baudoin v. Acadia Parish Police Jury, 96-1288, p. 10-11 (La.App. 3 Cir. 9/17/97); 702 So.2d 715, 720, writ den. 97-2546 (La.12/19/97); 706 So.2d 458, and Guinn v. Rapides Parish Police Jury 97-1519 (La.App. 3 Cir. 4/1/98); 708 So.2d 835, 838, writ den. 98-1113 (La.6/5/98, 720 So.2d 685) would seem to say, "No."
[7] LSA-R.S. 39:1303 A
[8] LSA-R.S. 39:1304
[9] LSA-R.S. 39:1304 C(2)
[10] This bracketed language was deleted by Act 236 of 1993, effective June 1, 1993, long before the August, 1994 transfer from the general liability fund took place of which the plaintiffs now complain. We find that this deliberate deletion in 1993 of the reference to "other funds" was intended to clarify what is apparent from the rest of the Louisiana Local Government Budget Act, i.e., that it was intended to apply only to general revenue funds and special revenue funds.
[11] LSA-R.S. 39:1303 A provides in pertinent part that:

The provisions of this Chapter shall be construed as minimal requirements and shall not prevent a political subdivision from requiring more extensive financial planning and budgeting practices nor from imposing more stringent penalties for violations.
The School Board has adopted a three percent tolerance which is more stringent than the five percent tolerance allowed by LSA-R.S. 39:1310A. However, the fact that 39:1303A allows a local political subdivision to adopt "more extensive financial planning and budgeting practices" does not mean that a violation of such locally adopted policies is considered to be a violation of the Local Government Budget Act. To put it another way, LSA-R.S. 39:1303A does not incorporate local budget policies by reference, it merely permits them and allows local entities to provide penalties for infractions against such local policies.
[12] Under Governmental Accounting Standards where an internal service fund is used to account for claims as it was by the School Board in setting up its General Liability Fund, the contributions to the General Liability Fund are treated like revenues coming in to a separate business by the Internal Service Fund/Proprietary Fund, and the General Fund accounts for them as expenditures as though made to an unrelated third party. Although GASB 10 confirms this, it was offered into evidence by neither party and this Court is not authorized to take judicial notice of it. Fortunately, our review of the record as a whole compels us to reach the same conclusion. To the extent we may not be able to take judicial notice of these accounting principles, they are the only reasonable conclusions to be reached from a careful review of the record. Thus, the plaintiffs' argument that the General Liability Fund did not have any revenue and therefore could not be a true proprietary fund is in error. Apparently there is much about governmental accounting that is counter intuitive from the perspective of a non-accountant. Therefore, it is understandable that the plaintiffs' attorneys took the position that they did on this issue.
[13] The "three or five percent standard" referred to by Mr. Berger only applies to the General Fund or Special Revenue Funds. To the extent that Mr. Henderson's testimony, or Mr. Berger's reading of Mr. Henderson's testimony, may be interpreted to conclude otherwise, such testimony would constitute an error of law.
[14] This means that the Proprietary Fund is not part of the general fund.
[15] Among his qualifications it was noted that he passed all sections of the C.P.A. exam on his first try!
[16] There is no evidence that would indicate that the Superintendent did not have this authority. Any finding to the contrary cannot be supported by the record and would be manifestly erroneous. Additionally, this description of the Superintendent's authority is supported by reference to LSA-R.S. 39:1304 D & E.
[17] Mr. Berger's restatement of Mr. Henderson's testimony does not add any weight to these inferences.